2011 ME 39

**CONCERNED CITIZENS TO
SAVE ROXBURY et al.**

v.

**BOARD OF ENVIRONMENTAL
PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 11, 2011.
Decided: March 24, 2011.

Rufus E. Brown, Esq. (orally), Brown & Burke, Portland, ME, for Concerned Citizens to Save Roxbury, the Silver Lake Camp Owners Association, and the individual appellants.

Janet T. Mills, Attorney General, Gerald D. Reid, Asst. Atty. Gen. (orally), Margaret Bensinger, Asst. Atty. Gen. (orally), Augusta, ME, for the Board of Environmental Protection.

Juliet T. Browne, Esq. (orally), Gordon R. Smith, Esq., Verrill Dana LLP, Portland, ME, for Record Hill Wind LLC.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

GORMAN, J.

[¶ 1] Pursuant to 38 M.R.S. § 346(4) (2010),[1] Concerned Citizens to Save Rox-

---

1. Title 38 M.R.S. § 346(4) (2010), as amended by P.L.2009, ch. 615, § E–5 (effective April 7, 2010), provides:

A person aggrieved by an order or decision of the board or commissioner regarding an application for an expedited wind energy development, as defined in Title 35–

bury, the Silver Lake Camp Owners Association, and several individuals (collectively CCSR) appeal from a decision of the Board of Environmental Protection that approved the issuance of permits to Record Hill Wind, LLC (Record Hill), to construct a wind energy facility in the Town of Roxbury. CCSR argues that the Board erred in (1) denying CCSR's request to hold a public hearing, and (2) finding that Record Hill satisfied applicable licensing requirements with respect to health effects from noise, financial capacity, and the establishment of a decommissioning plan.[2] We disagree with these contentions and affirm the Board's decision.

## I. BACKGROUND

[¶ 2] In December 2008, Record Hill filed an application with the Department of Environmental Protection for permits, pursuant to the Site Location of Development statute, 38 M.R.S. §§ 481–490 (2008) (the Site Location statute), and the Natural Resources Protection Act, 38 M.R.S. §§ 480–A to 480–GG (2008) (the NRPA),[3] to construct the Record Hill Wind Project in Roxbury. This project involves the construction of a 50.6–megawatt wind energy generation facility consisting of twenty-two wind turbines to be located along the ridgelines of Record Hill, Flathead Mountain, and Partridge Peak; new access roads and a crane path; electrical transmission lines; an electrical collector substation; two meteorological towers; and an operations and maintenance building. Because the project is "a grid-scale wind energy development that is proposed for location within an expedited permitting area," it is considered to be an "expedited wind energy development." 35–A M.R.S. § 3451(4) (2010).

[¶ 3] In its application, Record Hill stated that the project would cost approximately $120 million, and that it intended to fund the project using third-party financing. Record Hill's application included a letter from CoBank, ACB, reciting that, although the bank was not providing a binding commitment to Record Hill, it "intend[ed] to provide financing for the Project subject to certain conditions." Record Hill later submitted a letter from another bank, Northern Trust Company, confirming that the controlling majority owner of Record Hill had an "availability of funds to finance" the project. With respect to the establishment of a decommissioning plan, Record Hill proposed to begin contributing

A, section 3451, subsection 4, or a general permit pursuant to section 480–HH or section 636–A may appeal to the Supreme Judicial Court sitting as the law court. These appeals to the law court must be taken in the manner provided in Title 5, chapter 375, subchapter 7.

Title 38 M.R.S. § 346(4) (2010) has since been amended, though that amendment is not relevant in the present case. P.L.2009, ch. 642, § B–4 (effective July 12, 2010).

2. In addition to these arguments, CCSR contends that the Board erred in denying, in part, its request to supplement the record. We find this argument unpersuasive and do not address it further.

3. The Site Location of Development statute, 38 M.R.S. §§ 481–490 (2008), has since been amended. P.L.2009, ch. 293, §§ 1–4 (effec-

tive Sept. 12, 2009); P.L.2009, ch. 506, §§ 1, 3 (effective March 15, 2010); P.L.2009, ch. 602, §§ 2–3 (effective April 2, 2010); P.L. 2009, ch. 615, §§ E–13 to E–20 (effective April 7, 2010). The Natural Resources Protection Act, 38 M.R.S. §§ 480–A to 480–GG (2008), has also been amended. P.L.2009, ch. 75, §§ 1–5 (effective Sept. 12, 2009); P.L. 2009, ch. 270, § A–2 (effective June 4, 2009); P.L.2009, ch. 295, § 1 (effective Sept. 12, 2009); P.L.2009, ch. 460, §§ 1–2 (effective Sept. 12, 2009); P.L.2009, ch. 537, §§ 3–4 (effective July 12, 2010); P.L.2009, ch. 561, §§ 37–38 (effective July 12, 2010); P.L.2009, ch. 615, §§ E–6 to E–12 (effective April 7, 2010). These amendments are not relevant in the present case.

money to a decommissioning fund in years eleven through fourteen of the project's operation.

[¶ 4] Record Hill also included a "Sound Level Assessment" with its application. This assessment, prepared by an engineering firm, predicted that the sound levels expected to result from operation of Record Hill's wind turbines would comply with the Department's rules concerning sound level limits.[4] *See* 38 M.R.S. § 484(3)(B); 2 C.M.R. 06 096 375–6 to –15 § 10 (2001). The engineering company also recommended that Record Hill monitor actual sound levels during operation of the project to ensure compliance with the Department's rules.

[¶ 5] Pursuant to 38 M.R.S. § 344(1) (2010), the Commissioner solicited comments from the public to be considered in determining whether to approve, approve with conditions, or disapprove Record Hill's application. *See* 38 M.R.S. § 344(2–A) (2009);[5] 2 C.M.R. 06 096 002–7 to –8 §§ 14, 16 (2003). Complying with this process, CCSR and other members of the public submitted written comments, reports, and other information regarding concerns about the project. Specifically, CCSR questioned the accuracy of Record

Hill's sound level assessment, asserting that the model used in the assessment: (1) was not designed for wind turbines; (2) improperly considered wind turbines as point sources of sound, as opposed to line sources; and (3) did not include a penalty for the occurrence of short duration repetitive sounds. CCSR also presented evidence of the adverse health effects from noise and low frequency sounds produced by wind turbines.[6]

[¶ 6] In February 2009, the Department held a public meeting pursuant to 38 M.R.S. § 345–A(5) (2010),[7] where the public could comment on and ask questions about the project. CCSR attended this meeting and submitted verbal and written comments challenging the accuracy of the sound assessment and asserting that noise from the proposed project would have an adverse impact on health. CCSR also presented a document entitled "Review of Noise Study for Record Hill Wind, LLC," prepared by an acoustical engineer, which discussed multiple reasons why the sound assessment submitted by Record Hill was "flawed" and "should be rejected." After the public meeting, CCSR continued to contact the Department with questions about the project, and continued to provide

---

4. The Department regulates sound levels for various developments, including wind energy developments. 2 C.M.R. 06 096 375–6 to –15 § 10(B)-(C) (2001). The applicable sound level limits are determined, in part, by the pre-development sound levels. 2 C.M.R. 06 096 375–7 to –8 § 10(C)(1)(a). If pre-development sound levels are below a certain level, a developer must comply with more stringent sound level limits. 2 C.M.R. 06 096 375–7 § 10(C)(1)(a)(v). In this case, the parties agree that the more stringent sound level limits apply.

5. Title 38 M.R.S. § 344(2–A) (2009) has since been amended, though not in any way that affects this case. P.L.2009, ch. 615, § E–3 (effective April 7, 2010).

6. One of the petitioners also filed a request that the Department hold an adjudicatory

hearing on the application. The Department denied this request.

7. Title 38 M.R.S. § 345–A(5) (2010) states:

At the board's or commissioner's discretion, the board or commissioner may schedule and hold public meetings in the geographic area of a proposed project for the purpose of collecting comments that become part of the record in a pending action. Any such meeting must be held during the period when written public comments may be submitted to the department. This subsection and the conduct of a public meeting do not change any other obligation the department has to hold public hearings that are mandatory by statute or required after a timely request is filed.

the Department with information supporting its concerns.

[¶ 7] As part of its review of Record Hill's application, the Department consulted with the Maine Center for Disease Control (MCDC), which issued a report in June of 2009 on the potential health effects from noise produced by wind turbines. The MCDC "found no evidence in peer-reviewed medical and public health literature of adverse health effects from the kinds of noise and vibrations [emitted] by wind turbines other than occasional reports of annoyances, and these are mitigated or disappear with proper placement of the turbines from nearby residences." Although the MCDC's report stated that exposure to high levels of low frequency noise could "be annoying and may adversely affect overall health," the MCDC determined that "these levels appear to be more intense than what is measured from modern wind turbines." The MCDC concluded that there was no reliable evidence that low frequency noise produced by wind turbines would cause significant adverse health effects, and that "[t]here are tremendous potential health benefits to wind turbines, including reductions in deaths, disability, and disease due to asthma, other lung diseases, heart disease, and cancer."

[¶ 8] The Department also retained a noise control consultant to evaluate Record Hill's sound assessment. In a report dated August 10, 2009, the consultant concluded that the assessment was "reasonable and technically correct according to standard engineering practices and the Department Regulations on Control of Noise." The consultant also opined that low frequency noise produced by wind turbines "fall[s] far below" common human perception.

[¶ 9] In a sixty-page order dated August 20, 2009, the Commissioner approved Record Hill's application for the Record Hill Wind Project, conditioned on Record Hill's implementation of a sound level compliance plan to monitor actual sound levels during routine operation of the project.[8] CCSR appealed the Commissioner's decision to the Board of Environmental Protection and requested a public hearing on the issues of the health effects of noise produced by wind turbines and Record Hill's compliance with the Department's sound level limits.

[¶ 10] During the autumn and early winter of 2009, CCSR and Record Hill submitted to the Board a number of documents that had not been included in the record before the Commissioner, but which one or the other wished to have the Board consider, either in support of CCSR's request for a public hearing, or as part of the Board's review of the Commissioner's decision. In a letter dated January 21, 2010, the chair of the Board notified the parties that the Board was accepting some of the documents, but rejecting others.[9] In that letter, the chair also told the parties that

---

8. As discussed below, the Commissioner has original jurisdiction over an application for an expedited wind energy development. 38 M.R.S. § 344(2–A)(A)(1); see 38 M.R.S. § 341–D(2) (2009). Title 38 M.R.S. § 341–D (2009) has since been amended, but not in any way that affects the present case. P.L. 2009, ch. 615, §§ E–1 to E–2 (effective April 7, 2010).

9. Pursuant to 38 M.R.S. § 341–D(4)(D), (5), the Board may accept supplemental evidence when the evidence is "relevant and material" and:

> [A]n interested party seeking to supplement the record has shown due diligence in bringing the evidence to the licensing process at the earliest possible time or the evidence is newly discovered and could not, by the exercise of diligence, have been discovered in time to be presented earlier in the licensing process.

See also 2 C.M.R. 06 096 002–11 § 24(B)(5) (2003).

no further documents could be submitted unless a public hearing was scheduled.

[¶ 11] After oral argument before the Board, on March 18, 2010, the Board denied CCSR's request for a public hearing, stating that the record was "adequately developed with regard to the statutory criteria" and that CCSR "did not demonstrate that there is sufficient conflicting technical evidence on a licensing criterion to warrant a public hearing." In the same order, the Board determined that Record Hill's application satisfied the requirements for the issuance of permits pursuant to the Site Location statute, the NRPA, and the Wind Energy Act, 35–A M.R.S. §§ 3401–3458 (2009).[10] It therefore approved Record Hill's application for development of the Record Hill Wind Project, but required Record Hill to submit updated documentation of its financial capacity at least fifteen days before resuming construction,[11] and imposed specific enumerated conditions intended to provide financial assurance that Record Hill would have sufficient reserve funds for decommissioning the project. Finally, as it relates to this appeal, the Board found that Record Hill had made adequate provisions to ensure that the project will be in compliance with the applicable sound level limits, and that the project would not have an unreasonable adverse health effect on the surrounding environment and protected locations. CCSR appeals from the Board's decision.

## II. DISCUSSION

### A. Identifying the Operative Decision

[¶ 12] First, we must determine whether the Commissioner's decision or the Board's decision is the operative decision in this appeal. Record Hill contends that the Board acted in an appellate capacity in reviewing the Commissioner's licensing decision and simply determined whether the Commissioner "arrived at the proper decision." Neither the Board nor CCSR presented any argument about which decision is the operative one for appellate review; both of those parties appear to assume that the Board's decision is the decision under review. We look first to the Maine statutes delineating the authority and responsibilities of the Commissioner and the Board in considering applications for wind energy developments in order to determine the proper scope of the Board's review.

[¶ 13] In 2004, the Legislature adopted the Maine Wind Energy Act, and included in the statute its finding that "it is in the public interest to encourage the construction and operation of community wind power generation facilities in the State." 35–A M.R.S. § 3402; see also P.L.2003, ch. 665, § 3 (effective July 30, 2004); P.L. 2005, ch. 646, § 3 (Aug. 23, 2006). In 2008, the Legislature amended the Act; the amendment contained its finding that "it is in the public interest to reduce the potential for controversy regarding siting of grid-scale wind energy development by expediting development in places where it is most compatible with existing patterns of development and resource values." To achieve that goal, the amendment directed that the State's existing regulatory process be modified to "encourage the siting of wind energy developments in these areas." P.L.2007, ch. 661, § A–5 (effective April 18, 2008) (codified at 35–A M.R.S.

---

10. The Wind Energy Act, 35–A M.R.S. §§ 3401–3458 (2009), has since been amended, but those amendments are not relevant in the present case. P.L.2009, ch. 615, §§ A–2 to A–4 (effective April 7, 2010); P.L.2009, ch.

642, §§ A–2 to A–7, B–2 (effective July 12, 2010).

11. Record Hill temporarily suspended construction of the project on November 24, 2009.

§ 3402(2)). Specifically, certain procedures of the Department and the Maine Land Use Regulation Commission in considering applications for wind energy developments were to be "refin[ed]." P.L. 2007, ch. 661, § A–5 (codified at 35–A M.R.S. § 3402(2)).

[¶ 14] One of the refinements enacted was a limitation on the original jurisdiction of the Board of Environmental Protection. *See* P.L.2007, ch. 661, §§ B–1, B–5 (effective April 18, 2008) (codified at 38 M.R.S. §§ 341–D(2), 344(2–A)(A)(1) (2009)). Generally, the Commissioner and the Board each has authority to issue licenses or permits on behalf of the Department. 38 M.R.S. § 341–A(4) (2010); *see* 38 M.R.S. § 344(2–A)(A). Pursuant to 38 M.R.S. § 341–D(2), however, the Board, which consists of ten members of the public appointed by the Governor, "shall assume jurisdiction" over applications for approval of those permits and licenses that, in the Board's judgment, involve a policy, rule, or law it has not previously interpreted; involve "important policy questions" it has not previously resolved; involve "important policy questions or interpretations of a rule or law that require reexamination"; or have "generated substantial public interest." 38 M.R.S. §§ 341–C, 341–D(2)(A)–(D) (2009); *see* 38 M.R.S. § 344(2–A)(A).

[¶ 15] Although wind energy development applications might fall within any or all of those criteria, the Board is specifically prohibited from assuming jurisdiction over applications for expedited wind energy developments. 38 M.R.S. §§ 341–D(2),

344(2–A)(A)(1). In the arena of wind energy development applications, the Commissioner must make the initial determination about whether to approve, approve with conditions, or disapprove an application. 38 M.R.S. § 344(2–A). If an aggrieved party appeals the Commissioner's decision on a license or permit application regarding an expedited wind energy development to the Board, the Board may hold a hearing at its discretion, and may affirm, amend, or reverse the decision, or may remand the matter to the Commissioner for further proceedings. 38 M.R.S. § 341–D(4), (4)(D) (2009); *see* 38 M.R.S. § 344(2–A). When reviewing the Commissioner's decision on a wind energy development application, the Board is to consider "the administrative record of the department ... and any supplemental information allowed by the board ... for supplementation of the record." 38 M.R.S. § 341–D(4)(D).

[¶ 16] Pursuant to 38 M.R.S. § 341–D(4)(A), when the Board is reviewing final license or permit decisions other than those involving wind energy development applications, it "is not bound by the commissioner's findings of fact or conclusions of law," and may "adopt, modify or reverse" those findings or conclusions. *See also* 38 M.R.S. § 341–D(4)(B)–(C).[12] Although 38 M.R.S. § 341–D(4)(D) does not specify that this standard of review is also to be applied to wind energy cases, the Department's own rules for processing cases contain a similar standard found in 2 C.M.R. § 06 096 002–12 24(B)(7) (2003),

---

12. Title 38 M.R.S. § 341–D(4)(B) states that the Board shall review:

License or permit decisions made by the commissioner that the board votes to review within 30 days of the next regularly scheduled board meeting following written notification to the board of the commissioner's decision. *Except as provided in para-*

*graph D, the procedures for review are the same as provided under paragraph A.*
(Emphasis added.) Subsection (4)(C) provides that the Board shall review "[l]icense or permit decisions appealed to the board under another law," and that "[u]nless the law provides otherwise, the standard of review is the same as provided under paragraph A." 38 M.R.S. § 341–D(4)(C).

which states that the Board "is not bound by the Commissioner's findings of fact or conclusions of law." [13]

[¶ 17]   Pursuant to that rule, the Board engaged in an independent review of the record in this case.   The record considered by the Board included not only the administrative record before the Commissioner, but also the supplemental evidence presented by the parties.   Based on its independent review, the Board made specific findings of fact with respect to whether Record Hill met applicable licensing requirements.   Because the Board acted as a fact-finder and reviewed the substantive issues de novo, we conclude it is the Board's decision that we review on appeal. *See FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶ 14, 926 A.2d 1197, 1201 ("When an agency act[s] as a tribunal of original jurisdiction, that is, as factfinder and decision maker, we review its decision directly." (quotation marks omitted)).

## B.   Public Hearing

■   [¶ 18]   CCSR contends that, because a public hearing was mandatory, the Board erred in denying its request for a public hearing.[14]   Alternatively, CCSR argues that, even if a public hearing was not mandatory, the Board abused its discretion in refusing to hold a public hearing.

■   [¶ 19]   "We review decisions made by an administrative agency for errors of law, abuse of discretion, or findings of fact not supported by the record." *Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 2010 ME 18, ¶ 12, 989 A.2d 1128, 1133 (quotation marks omitted).

[¶ 20]   CCSR relies on 2 C.M.R. 06 096 002-4 § 7(B) (2003) for its argument that the Board was required to hold a public hearing.   This rule provides:

> **Criteria for holding public hearings.** Public hearings are discretionary unless otherwise provided by law.   The Commissioner may conduct a public hearing on any application.   The Board may conduct a public hearing on any application over which it has assumed jurisdiction or any appeal or petition for reconsideration.   *The Department will hold public hearings in those instances where the Department determines there is credible conflicting technical information regarding a licensing criterion and it is likely that a public hearing will assist the decision maker in understanding the evidence.*   When the Board assumes jurisdiction over an application, it will hold a public hearing unless it votes otherwise at the time it assumes jurisdiction.

2 C.M.R. 06 096 002-4 § 7(B) (emphasis added).   According to CCSR, this rule imposes a mandatory obligation on the Board to hold a public hearing whenever the two criteria highlighted above are satisfied. The Board, on the other hand, argues that

---

**13.**   Volume 2 C.M.R. 06 096 002-3 § 2(A) (2003) states:

> **General scope.**   These rules apply to processing of applications made to the Department for new, renewed, amended or transferred licenses, and other determinations on specific matters made by the Department, except as noted in section 2(B) of this rule. These rules apply in the absence of procedural requirements imposed by statute or rule.   Where other specific procedural requirements apply, those requirements control.

Because 38 M.R.S. § 341–D(4) does not expressly limit the Board's authority to review the Commissioner's decision de novo, and there are no apparent procedural requirements imposed by statute or rule, the Department's rules apply. *See Rudolph v. Golick*, 2010 ME 106, ¶ 7, 8 A.3d 684, 686.

**14.**   CCSR does not challenge the Board's refusal to hold a public hearing on due process grounds.

the language "will hold public hearings" simply explains how the agency intends to exercise its discretion regarding hearings.

[¶ 21] Title 38 M.R.S. § 345–A(1–A) (2010) provides that the Board may conduct a public hearing as necessary to carry out its statutory responsibilities. As stated above, one responsibility of the Board includes reviewing licensing or permitting decisions of the Commissioner with respect to expedited wind energy developments. *See* 38 M.R.S. § 341–D(4), (4)(D). When the Board reviews these decisions, it "may hold a hearing at its discretion on and may affirm, amend, reverse or remand to the commissioner for further proceedings." 38 M.R.S. § 341–D(4); *see* 2 C.M.R. 06 096 002–12 § 24(B)(7). The Board's decision must be based on "the administrative record of the department, including the record of any adjudicatory hearing held by the *department*, and any supplemental information allowed by the board." 38 M.R.S. § 341–D(4)(D) (emphasis added). Title 38 M.R.S. § 341–A(2) (2010) explains that the "department shall consist of the Board of Environmental Protection ... and of a Commissioner of Environmental Protection." *See also* 2 C.M.R. 06 096 002–2 § 1(D), (F), (G) (2003) (defining the terms "Board," "Commissioner," and "Department").

[¶ 22] Similarly, the Department's rules provide that any aggrieved person may appeal the Commissioner's licensing decision to the Board, and that any appeal "must specify whether the appellant desires the Board to hold a public hearing on its appeal." 2 C.M.R. 06 096 002–11 § 24(B)(1). Those same rules provide that the Board may hold a public hearing when,

in its discretion, a hearing is warranted. 2 C.M.R. 06 096 002–11 § 24(B)(1).

[¶ 23] Because 38 M.R.S. §§ 341–D(4), (4)(D), 345–A(1–A), and the Department's rules make it clear that the Board has discretion in deciding whether to hold a public hearing when reviewing a licensing decision of the Commissioner, the Board did not err in concluding that the question of whether to hold a public hearing was within its discretion. In addition, because the record before the Board was voluminous and included numerous written comments, studies, and information submitted by both Record Hill and CCSR, we see no reason to conclude that the Board abused its discretion or otherwise erred in denying CCSR's request to conduct a public hearing on the ground that the record was "adequately developed." [15]

## C. Factual Findings

[¶ 24] "We must affirm findings of fact if they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Friends of Lincoln Lakes*, 2010 ME 18, ¶ 13, 989 A.2d at 1133. In applying the "substantial evidence" standard, we do not weigh the merits of evidence; we determine whether there is "any competent evidence in the record to support a finding." *Id.* ¶ 14, 989 A.2d at 1134; *see also* 5 M.R.S. § 11007(3) (2010). "Upon review of an agency's findings of fact we must examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Friends of Lincoln Lakes*, 2010 ME

---

15. Even if we were to accept CCSR's argument that the Board must hold a public hearing when it determines that "there is credible conflicting technical information regarding a licensing criterion and it is likely that a public hearing will assist the decision maker in understanding the evidence," the Board specifically did not determine that either criterion had been satisfied. 2 C.M.R. 06 096 002–4 § 7(B) (2003).

18, ¶ 13, 989 A.2d at 1133 (quotation marks omitted). An agency's findings of fact will be vacated "only if there is no competent evidence in the record to support a decision." *Id.* ¶ 14, 989 A.2d at 1134.

### 1. Health Effects

[¶ 25] CCSR argues that the Board erred in finding that Record Hill satisfied applicable licensing requirements with respect to the health effects of noise from operation of the Record Hill Wind Project.[16] CCSR also contends that the Board should have imposed additional restrictions on Record Hill relating to noise in order to protect the public from adverse health effects.

[¶ 26] Pursuant to the Site Location statute, the Board must determine whether Record Hill "made adequate provision for fitting the development harmoniously into the existing natural environment and that the development will not adversely affect existing uses." 38 M.R.S. § 484(3). In making this determination, the Board considers its rules relating to noise. 38 M.R.S. § 484(3)(B); *see* 2 C.M.R. 06 096 375–6 to –15 § 10 (2001). The Board may impose "any reasonable requirement to ensure that the developer has made adequate provision for the control of noise from the development and to reduce the impact of noise on protected locations." 2 C.M.R. 06 096 375–10 § 10(E).

[¶ 27] We conclude that the Board's findings concerning the health effects of wind turbine noise are supported by substantial evidence in the record. The report of the MCDC and the noise control consultant's opinion both support the finding that the Record Hill Wind Project will not generate unreasonable adverse health effects. Although CCSR submitted contrary evidence, "[w]e cannot reject the Board's finding on the grounds that other evidence in the record supports a different factual finding." *See Friends of Lincoln Lakes*, 2010 ME 18, ¶ 20, 989 A.2d at 1135. In addition, although CCSR contends that the Board failed to impose further conditions on Record Hill, the Board was not required to do so given its finding relating to the health effects associated with the project.

### 2. Financial Capacity

[¶ 28] CCSR next argues that the evidence in the record is insufficient to support a finding that Record Hill has sufficient financial capacity to develop the project. In order to approve an expedited wind energy development, the Department must find that "[t]he developer has the financial capacity and technical ability to develop the project in a manner consistent with state environmental standards and with the provisions of this article." 38 M.R.S. § 484(1). In this case, the record includes a letter submitted by Record Hill demonstrating a bank's intent to fund the project. There is also evidence demonstrating that the controlling owner of Record Hill has sufficient funds to finance the entire project. On this record, we conclude that there is substantial evidence to support the Board's finding of financial capacity.

### 3. Decommissioning Plan

[¶ 29] CCSR finally contends that the Board erred in finding that Record Hill satisfied licensing requirements

---

16. CCSR does not challenge the Board's finding that the Record Hill Wind Project would comply with the Department's existing sound level limits, and, with regard to its argument that compliance with the sound level limits does not provide adequate protection for the public, CCSR conceded at oral argument that it was not pursuing its challenge to the existing sound level limits in this proceeding. *See* 5 M.R.S. § 8058 (2010).

with respect to the establishment of a decommissioning plan.

[¶ 30] In a 2008 amendment to the Wind Energy Act, the Legislature specified that the Department must identify the submission requirements relating to decommissioning plans for wind energy development applications.[17] P.L.2007, ch. 661, § B–13 (effective April 18, 2008). In its March 2010 order, the Board noted that, in submitting a wind energy development application, an applicant is required to include a decommissioning plan that would be unaffected by the applicant's future financial condition.

[¶ 31] In this case, the Board's finding that Record Hill satisfied licensing requirements with respect to establishing a decommissioning plan is supported by substantial evidence in the record. Record Hill proposed to begin contributing money to a decommissioning fund in years eleven through fourteen of operation, but the Board reasoned that "a steadier and more frequently reassessed set aside of funds is prudent." The Board ordered Record Hill to begin reserving funds for decommissioning in the first year of operation, and further required a reassessment of the salvage value and decommissioning costs in years seven and fifteen of operation. Contrary to CCSR's contentions, the Board did not abuse its discretion or otherwise err in its determination on this issue.

The entry is:

Decision of the Board of Environmental Protection affirmed.

---

17. Although this amendment has not been codified in Title 38, the Department nonetheless requires developers to submit decommissioning plans as part of any wind energy development application. *See* Me. Dep't of Envtl. Prot., *Site Law Application*, § 29 http://www.maine.gov/dep/blwq/docstand/sitelaw/application_text.pdf. In this 2008 amendment, the Legislature required the Department to identify the applicable licensing requirements for wind energy development applications relating to:

Decommissioning plans, including demonstration of current and future financial capacity that would be unaffected by the applicant's future financial condition to fully fund any necessary decommissioning costs commensurate with the project's scale, location and other relevant considerations, including, but not limited to, those associated with site restoration and turbine removal.

P.L.2007, ch. 661, § B–13 (effective April 18, 2008).