2011 ME 40

**MARTHA A. POWERS TRUST et al.**

v.

**BOARD OF ENVIRONMENTAL PROTECTION et al.**

Supreme Judicial Court of Maine.

Argued: Jan. 11, 2011.
Decided: March 24, 2011.

---

Rufus E. Brown, Esq. (orally), Brown & Burke, Portland, ME, for Martha A. Powers Trust and Brian Raynes.

1. This statute provides:

A person aggrieved by an order or decision of the board or commissioner regarding an application for an expedited wind energy development, as defined in Title 35–A, section 3451, subsection 4, or a general permit pursuant to section 480–HH or section 636–A may appeal to the Supreme Judicial Court sitting as the law court. These appeals to the law court must be taken in the manner provided in Title 5, chapter 375, subchapter 7.

Janet T. Mills, Attorney General, Gerald D. Reid, Asst. Atty. Gen. (orally), Margaret Bensinger, Asst. Atty. Gen. (orally), Augusta, ME, for the Board of Environmental Protection.

Juliet T. Browne, Esq. (orally), Gordon R. Smith, Esq., Verrill Dana LLP, Portland, ME, for Evergreen Wind Power II, LLC.

Panel: SAUFLEY, C.J., and ALEXANDER, LEVY, SILVER, MEAD, GORMAN, and JABAR, JJ.

GORMAN, J.

[¶ 1]   Martha A. Powers Trust and Brian Raynes (collectively Trust) appeal, pursuant to 38 M.R.S. § 346(4) (2010),[1] from a decision of the Board of Environmental Protection. The Board approved the issuance of permits to Evergreen Wind Power II, LLC (Evergreen), to construct the Oakfield Wind Project. The Trust contends that the Board abused its discretion in denying the Trust's request to hold a public hearing, and that the Board erred in finding that Evergreen met applicable licensing requirements with respect to the health effects from noise, decommissioning the project, and financial capacity to fund the project. Because we conclude that the Board did not abuse its discretion or err in its findings, we affirm the Board's decision.[2]

2. We review the Board's decision on appeal because the Board engaged in a de novo review of the record and acted as a factfinder. *See Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.,* 2011 ME 39, ¶¶ 12–17, 15 A.3d 1263, 1268–70; *see also* 2 C.M.R. 06 096 002–12 § 24(B)(7) (2003).

38 M.R.S. § 346(4) (2010); P.L.2009, ch. 615, § E–5 (effective April 7, 2010). Title 38 M.R.S. § 346(4) (2010) has since been amended, but not in any way that affects the present case. P.L.2009, ch. 642, § B–4 (effective July 12, 2010).

## I. BACKGROUND

[¶ 2] On April 7, 2009, Evergreen filed an application with the Department of Environmental Protection for permits to construct the Oakfield Wind Project, a fifty-one-megawatt wind energy generation facility, in the Town of Oakfield. *See* 35-A M.R.S. §§ 3452–3455 (2008);[3] 38 M.R.S. §§ 480–A to 480–GG, 481–490 (2008).[4] Evergreen's project involves the construction of thirty-four wind turbines, to be located along the ridgelines of Sam Drew Mountain and Oakfield Hills; access roads and a crane path; approximately twelve miles of an electrical collector line; an electrical collector substation; four meteorological towers; and an operations and maintenance building. This project is an "expedited wind energy development" because it is "a grid-scale wind energy development that is proposed for location within an expedited permitting area." 35-A M.R.S. § 3451(4) (2010).

[¶ 3] In its application, Evergreen stated that the project would cost approximately $125 million, and that First Wind Holdings, LLC, would provide initial funding for the project. Evergreen submitted a letter from First Wind stating that First Wind is committed and able "to fund the development, construction, and operation of the approximately $125 million Oakfield Wind Project." Evergreen's application also included a letter from HSH Nordbank, which recited that HSH Nordbank "has a strong working relationship with First Wind," and that it is "a likely candidate to provide the debt financing for the Project." In terms of a decommissioning plan, Evergreen stated that it would reserve $50,000 for decommissioning in each of the first seven years of the project, starting from the time of construction. Evergreen also proposed to reassess decommissioning costs by the end of year fifteen of the project's operation. After the reassessment, Evergreen would then reserve the remaining balance of the decommissioning costs.

[¶ 4] With its application, Evergreen submitted a "Sound Level Assessment" prepared by an engineering company, which concluded that "sound levels from operation of the Oakfield Wind Project will not exceed Maine DEP sound level[ ] limits during construction or routine operation." *See* 38 M.R.S. § 484(3)(B); 2 C.M.R. 06 096 375–6 to –15 § 10 (2001). To "verify" compliance with the Department's sound level limits, the engineering company recommended that Evergreen monitor actual sound levels during operation of the project.

[¶ 5] During the Department's review of Evergreen's application for the Oakfield Wind Project, the Trust, which owns property in the vicinity of the project, submitted comments regarding concerns about the project. The Trust questioned the accuracy of the "Sound Level Assessment" prepared by the engineering company, and presented evidence in an effort to show that operation of the wind turbines would cause adverse health effects.

[¶ 6] In its review of Evergreen's application, the Department hired a noise control consultant, who concluded that the sound assessment submitted by Evergreen was "reasonable and technically correct according to standard engineering practices and the Department Regulations on Con-

---

**3.** Title 35-A M.R.S. § 3454 (2008) has since been amended, but not in any way that affects the present case. P.L.2009, ch. 642, § A–7 (effective July 12, 2010).

**4.** The Site Location of Development statute, 38 M.R.S. §§ 481–490 (2008), and the Natural Resources Protection Act, 38 M.R.S. §§ 480–A to 480–GG (2008), have since been amended, but these amendments are not relevant in the present case.

trol of Noise." The Department also consulted with the Maine Center for Disease Control (MCDC). The MCDC issued a report in June 2009, which stated that it "found no evidence in peer-reviewed medical and public health literature of adverse health effects from the kinds of noise and vibrations [emitted] by wind turbines." In July 2009, the Department held a public meeting in Oakfield to provide an opportunity for the public to submit information or ask questions about the project.

[¶ 7] On January 21, 2010, the Commissioner of Environmental Protection approved Evergreen's application for the Oakfield Wind Project.[5] The Trust appealed the Commissioner's decision to the Board of Environmental Protection. In its appeal, the Trust requested that the Board conduct a public hearing with respect to Evergreen's compliance with the Department's sound level limits and the health effects of noise from operation of the wind turbines.

[¶ 8] On June 11, 2010, the Board issued an order denying the Trust's request for a public hearing and approving Evergreen's application for development of the Oakfield Wind Project, subject to several conditions. The Board required Evergreen to submit final documentation of its financial capacity before beginning construction of the project, and also conditioned its approval on certain adjustments to Evergreen's decommissioning plan. Finally, the Board ordered Evergreen to implement a sound level compliance plan to monitor actual sound levels during routine operation of the project. The Trust appeals from the Board's decision.

## II. DISCUSSION

### A. Public Hearing

[¶ 9] On appeal, the Trust contends that the Board was required to hold a public hearing. We addressed this exact argument in *Concerned Citizens to Save Roxbury v. Board of Environmental Protection*, 2011 ME 39, ¶¶ 18–23, 15 A.3d 1263, 1270–71. In that case, we determined that the Board has discretion to decide whether to hold a public hearing when reviewing the Commissioner's decision on an application for an expedited wind energy development. *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 23, 15 A.3d at 1271; *see also* 38 M.R.S. § 345–A(1–A), (2) (2010); 38 M.R.S. § 341–D(4), (4)(D) (2009);[6] 2 C.M.R. 06 096 002–4 to –5, –12 §§ 7(B)-(C), 24(B)(7) (2003).

[¶ 10] The Trust also argues that the Board abused its discretion in denying the Trust's request to conduct a public hearing. In this case, the Board concluded that the record was "adequately developed with regard to the statutory criteria" and that the Trust "did not demonstrate that a public hearing is warranted due to conflicting technical evidence on a licensing criterion or in order for the Board to understand the evidence." When the Board denied the Trust's request for a public hearing on the issues of compliance with the Department's sound level limits and the health effects of noise, the Board had before it a voluminous record. The record included numerous comments, letters, and reports questioning the accuracy of Evergreen's sound assessment, includ-

5. The Commissioner of Environmental Protection has original jurisdiction over an application for an expedited wind energy development. 38 M.R.S. § 344(2–A)(A)(1) (2009); *see also* 38 M.R.S. § 341–D(2) (2009); *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 15, 15 A.3d at 1269. Title 38 M.R.S. §§ 341–D(2), 344(2–A)(A)(1) (2009) has since been amended, but not in any way that affects the present case. P.L.2009, ch. 615, §§ E–1, E–3 (effective April 7, 2010).

6. Title 38 M.R.S. § 341–D(4)(D) (2009) has since been amended, but that amendment is not relevant here. P.L.2009, ch. 615, § E–2 (effective April 7, 2010).

ing a review prepared by a noise consultant on behalf of the Trust; literature and articles relating to the health effects of nighttime noise; and other information relating to noise propagated by wind turbines. Based on the record before it, the Board determined that a public hearing was not warranted, and we conclude that the Board did not abuse its discretion in making this determination.

### B. Factual Findings

[¶ 11] We review an agency's findings of fact to determine if there is "substantial evidence in the record" to support the findings. *Friends of Lincoln Lakes v. Bd of Envtl. Prot.*, 2010 ME 18, ¶ 13, 989 A.2d 1128, 1133. In making this determination, "we must examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did." *Id.* (quotation marks omitted). We must affirm the findings of fact if there is "any competent evidence in the record" to support them. *Id.* ¶ 14, 989 A.2d at 1134; *see also* 5 M.R.S. § 11007(3) (2010).

### 1. Health Effects

[¶ 12] The Trust first challenges the Board's finding that operation of the Oakfield Wind Project would not cause unreasonable adverse health effects. We addressed similar arguments in *Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶¶ 25–27, 15 A.3d at 1272. The record presented in this case, like the record in *Concerned Citizens to Save Roxbury*, contains reports from the MCDC and from the noise control consultant that support the Board's finding that operation of the proposed wind energy project would not generate unreasonable adverse health effects. *Id.* ¶ 27, 15 A.3d at 1272; *see also*

*Friends of Lincoln Lakes*, 2010 ME 18, ¶ 20, 989 A.2d at 1135. Accordingly, although the Trust contests the evidence, we conclude that there is substantial evidence in the record to support the Board's finding.

[¶ 13] The Trust also contends that the Board should have imposed additional requirements on Evergreen to ensure that noise from the project would not cause adverse health effects. This argument is based, in large part, on the Trust's assertion that the Department's noise regulations, which were last amended in 1989, do not address the unique features of the noise propagated by wind turbines, including low frequency noise.[7] Pursuant to the Department's regulations, the Board may, "as a term or condition of approval, establish any reasonable requirement to ensure that the developer has made adequate provision for the control of noise from the development and to reduce the impact of noise on protected locations." 2 C.M.R. 06 096 375–10 § 10(E). As explained above, the Board found that noise from the project would not cause unreasonable adverse health effects, and this finding is supported by substantial evidence in the record. Having made this finding, the Board had no reason to impose additional conditions on Evergreen.

### 2. Decommissioning Plan

[¶ 14] The Trust argues that the evidence in the record is insufficient to support a finding that Evergreen satisfied applicable licensing requirements relating to the establishment of a decommissioning plan. Contrary to the Trust's contentions, there is substantial evidence in the record to support the Board's finding. In its application, Evergreen proposed to reserve $50,000 in a decommissioning fund in years

---

**7.** At oral argument, the Trust conceded that it was not pursuing its challenge to the Department's existing sound level limits in this proceeding.

one through seven, commencing with construction of the project. The Board adopted this plan, but required Evergreen to reassess the salvage value and decommissioning costs in year seven of operation, as well as in year fifteen. The Board also ordered Evergreen to make annual contributions in years eight through fifteen in order to fully fund the decommissioning costs by the end of year fifteen. Based on this record, we conclude that there is substantial evidence to support the Board's finding with respect to decommissioning the project. *See Concerned Citizens to Save Roxbury,* 2011 ME 39, ¶¶ 29–31, 15 A.3d at 1272–73.

### 3. Financial Capacity

■ [¶ 15] Finally, the Trust asserts that the Board erred in finding that Evergreen satisfied applicable licensing requirements with respect to financing the project.

[¶ 16] To approve an application for an expedited wind energy development, the Department must find that "[t]he developer has the financial capacity and technical ability to develop the project in a manner consistent with state environmental standards and with the provisions of this article." 38 M.R.S. § 484(1). We conclude that the record contains substantial evidence that Evergreen has financial capacity for the project. Evergreen submitted both a commitment from First Wind that it intended to fully finance the project, and a letter from a bank reporting that it was likely to provide the project's debt financing. Although the Trust submitted contrary evidence with respect to Evergreen's ability to finance the project, "[w]e cannot reject the Board's finding on the grounds that other evidence in the record supports a different factual finding." *Friends of Lincoln Lakes,* 2010 ME 18, ¶ 20, 989 A.2d at 1135.

The entry is:

Decision of the Board of Environmental Protection affirmed.