MAINE SUPREME JUDICIAL COURT                              Reporter of Decisions
Decision:     2015 ME 156
Docket:       BEP-14-291
Argued:       April 8, 2015
Decided:      December 3, 2015

Panel:        SAUFLEY, C.J., and MEAD, GORMAN, JABAR, and CLIFFORD, JJ.


CHAMPLAIN WIND, LLC

v.

BOARD OF ENVIRONMENTAL PROTECTION


SAUFLEY, C.J.

[¶1]   Champlain Wind, LLC, appeals from a decision of the Board of Environmental Protection in which the Board considered and balanced competing statutorily defined policies applicable to wind energy projects in Maine.  The applicable statutes establish the dual policies of expediting wind energy development in defined geographic areas of Maine and at the same time providing enhanced protection for specific scenic resources.  Champlain proposed the Bowers Wind Project to be situated within, but very near, the geographic border of the expedited permitting area.  Within sight of the proposed wind turbines lie several scenic resources of state or national significance.  On the record before us, we do not disturb the Board's balancing of the Legislature's policies, and we affirm the Board's denial of a permit for the Project.

## I. COMPETING LEGISLATIVE PRIORITIES

[¶2] In 2004, the Maine Legislature enacted the Maine Wind Energy Act,[1] and in 2008, it enacted additional statutes governing "Expedited Permitting of Grid-Scale Wind Energy Development."[2] As subsequently amended, the Wind Energy Act has a stated purpose to "encourage the development, where appropriate, of wind energy production in the State." 35-A M.R.S. § 3402 (2014). To support and expedite permitting of wind energy projects, an "expedited permitting area" has been established to "reduce the potential for controversy regarding siting of grid-scale wind energy development by expediting development in places where it is most compatible with existing patterns of development and resource values when considered broadly at the landscape level." 35-A M.R.S. §§ 3402(2), 3451(3) (2014).

[¶3] One of the primary goals of the wind energy statutes is to reduce and, where possible, eliminate costly opposition to wind projects based on the visual impact of the wind turbines. Recognizing that "wind turbines are potentially a highly visible feature of the landscape that will have an impact on views," *id.* § 3402(2)(C), the Board is prohibited by statute from denying a wind energy

---

[1] *See* P.L. 2003, ch. 665, § 3 (effective July 30, 2004) (codified as subsequently amended at 35-A M.R.S. §§ 3401-3404 (2014)).

[2] *See* P.L. 2007, ch. 661, § A-7 (emergency, effective Apr. 18, 2008) (codified as subsequently amended at 35-A M.R.S. §§ 3451-3459 (2014)).

development permit on the sole basis that "generating facilities are a highly visible feature in the landscape." 35-A M.R.S. § 3452(3) (2014). Expedited wind energy developments are not required to meet the more stringent standard of "fitting . . . harmoniously into the existing natural environment," which is otherwise required by the environmental protection statute governing site location for development projects. 38 M.R.S. § 484(3) (2014); *see* 35-A M.R.S. § 3452(1) (2014).

[¶4] Concurrently, to ensure that the statutes also protect certain scenic geographic areas, the Legislature has identified areas where the visual impact of prospective wind energy developments must be more closely scrutinized. Specifically, an expedited wind energy development must not "significantly compromise[] views from a scenic resource of state or national significance such that the development has an unreasonable adverse effect on the scenic character or existing uses related to scenic character of the scenic resource of state or national significance." 35-A M.R.S. § 3452(1). A "scenic resource of state or national significance" is defined to include national natural landmarks, certain historic places, national or state parks, great ponds, and other places of scenic significance. *See* 35-A M.R.S. § 3451(9) (2014).[3]

---

[3] Although not at issue here, the Legislature and the Land Use Planning Commission have completely excluded from the expedited permitting area specifically identified areas of particular ecological, recreational, and scenic significance, including Baxter State Park, a large portion of the Downeast Lakes region, and other waters subject to tidal influence. *See* 35-A M.R.S. § 3451(3) (2014); 1A C.M.R. 01 672

4

[¶5]   Thus, the Legislature has attempted to improve the predictability of siting decisions by creating a more streamlined, lower-cost regulatory process for wind energy development in the expedited permitting area, while at the same time it has sought to protect particularly important scenic resources in Maine by requiring stricter scenic standards in specified geographic areas.

## II.  BOWERS WIND PROJECT

[¶6]   Both geographically and analytically, the Bowers Wind Project falls on the line between competing legislative purposes—expediting the development of wind power and protecting identified scenic resources.  The Project would place sixteen wind turbines, with a combined generating capacity of forty-eight megawatts,[4] just within the boundary of the expedited permitting area, making them visible from multiple scenic resources of state or national significance.

[¶7]   Champlain filed a consolidated application with the Department of Environmental Protection in October 2012 seeking permits to construct the Project in Carroll Plantation and Kossuth Township.  *See* 35-A M.R.S. § 3451(4) (2014). Although the Project is proposed to be developed within the expedited permitting area, its turbines would be visible from nine great ponds, each of which is rated as

---

010-200 Appendix F (2014); *see also* Report of the Governor's Task Force on Wind Power Development: Finding Common Ground For a Common Purpose 18 n.2 (Feb. 2008).

   [4]  For context, the legislatively established goal for wind energy development in Maine is set at, at least, 2,000 megawatts of installed capacity by this year, 2015.  *See* 35-A M.R.S. § 3404(2)(A) (2014).

outstanding or significant from a scenic perspective in the Maine Wildlands Lake Assessment and thus is classified as a scenic resource of state or national significance. *See id.* § 3451(9)(D)(2); Me. Dep't of Conservation, Land Use Regulation Comm'n, Maine Wildlands Lake Assessment, pt. V (Master List of Lakes) (June 1, 1987). Most of the area of the nine great ponds affected by the Project is excluded from the expedited permitting area.

[¶8] The Department ultimately denied Champlain's application after evaluating data collected by both Champlain's and the Department's experts concerning the scenic impact that the Project would have on the affected great ponds, reviewing a user intercept survey, holding a public hearing,[5] and conducting multiple site visits. The Department concluded that the Project did not satisfy the statutory scenic standard because the project "would have an unreasonable adverse effect on the scenic character and existing uses related to the scenic character" of the nine affected great ponds. With the exception of the scenic standard, the Department found that Champlain had met all of the permit criteria.

---

[5] Before the public hearing, an individual, David Corrigan, and an organization that opposes the project, the Partnership for the Preservation of the Downeast Lakes Watershed (PPDLW), intervened in opposition to the Project. The Maine Renewable Energy Association, a professional trade association of power producers including wind energy producers, and the Conservation Law Foundation, a New England environmental advocacy organization, intervened in support of the project. PPDLW and the Conservation Law Foundation each submitted an amicus curiae brief in the matter before us.

6

[¶9] Champlain appealed from the Department's denial to the Board of Environmental Protection. *See* 38 M.R.S. § 341-D(4) (2014). The Board considered the evidence in the record, heard a presentation by the Department, and heard oral argument from the parties involved. Multiple parties submitted proposed supplemental evidence, but the Board did not admit any of that evidence into the administrative record because it found that the evidence was neither relevant nor material. *See id.*; 2 C.M.R. 06 096 002-12 § 24(D)(2) (2013).

[¶10] In June 2014, the Board issued an order affirming the Department's denial of Champlain's permit application. Although the Board did not specifically find that the Project would have an unreasonable adverse effect on the scenic character or existing uses related to scenic character on any *one* of the affected great ponds, the Board concluded that "the proposed project would unreasonably adversely affect scenic character and existing uses related to scenic character." Champlain filed a timely petition for review of the Board's final agency action pursuant to 38 M.R.S. § 346(4) (2014), 5 M.R.S. § 11002 (2014), and M.R. Civ. P. 80C.

## III. DISCUSSION

A. The Dispute

[¶11] Primarily, Champlain argues that the Board unlawfully aggregated the scenic impact of the Project on the nine affected great ponds in reaching its

conclusion that the Project would have an unreasonable adverse scenic effect, contravening the plain language of the Wind Energy Act and related statutes.[6] Champlain argues that because the Board did not find that the Project had an unreasonable adverse effect on the scenic character or existing uses related to scenic character of any one specific affected great pond alone, it could not have concluded that the project failed to satisfy the statutory standards. Champlain further argues that in aggregating the scenic impact, the Board applied the Act and related statutes arbitrarily because there are no standards to guide the exercise of the Board's discretion in evaluating aggregated scenic impacts.

[¶12] The Board responds that it is authorized to consider the overall impact of the Project on the nine affected great ponds. Section 3452(3), it argues, authorizes the Board to take a "holistic approach" when considering the impact a proposed project may have on multiple scenic resources of state or national significance.[7] Moreover, the Board argues that its decision to deny Champlain's

---

[6] We are not persuaded by Champlain's subsidiary arguments that the Board's decision is unsupported by the evidence in the record, *see Kroeger v. Dep't of Envtl. Prot.*, 2005 ME 50, ¶¶ 8-14, 870 A.2d 566, and that the Board's consideration of the overall impact of the Project is not judicially enforceable because it constitutes a rule that has not been adopted in accordance with the rulemaking provisions of the Maine Administrative Procedure Act, *see S.D. Warren Co. v. Bd. of Envtl. Prot.*, 2005 ME 27, ¶ 30, 868 A.2d 210, *aff'd*, 547 U.S. 370 (2006).

[7] A determination that an expedited wind energy development meets the scenic standard imposed by the Wind Energy Act can be made only after evaluating specific criteria, including

    **A.** The significance of the potentially affected scenic resource of state or national significance;

    **B.** The existing character of the surrounding area;

8

permit application was not arbitrary; it simply applied the existing scenic standard to an unprecedented factual situation—a project that would simultaneously affect nine scenic resources of state or national significance, including many unusually interconnected great ponds, most of which were fully carved out of the expedited permitting area by the Legislature.

B.      The Role of the Board and the Standard of Review

[¶13]  As created by the Maine Legislature, the Board[8] is uniquely situated to make decisions regarding competing legislatively established environmental policies.  It has been entrusted with making "informed, independent and timely decisions" regarding those environmental policies.  *See* 38 M.R.S. § 341-B

---

**C.**   The expectations of the typical viewer;

**D.**   The expedited wind energy development's purpose and the context of the proposed activity;

**E.**   The extent, nature and duration of potentially affected public uses of the scenic resource of state or national significance and the potential effect of the generating facilities' presence on the public's continued use and enjoyment of the scenic resource of state or national significance; and

**F.**   The scope and scale of the potential effect of views of the generating facilities on the scenic resource of state or national significance, including but not limited to issues related to the number and extent of turbines visible from the scenic resource of state or national significance, the distance from the scenic resource of state or national significance and the effect of prominent features of the development on the landscape.

35-A M.R.S. § 3452(3) (2014).

[8]  The Board is composed of "7 members appointed by the Governor, subject to review by the joint standing committee of the Legislature having jurisdiction over natural resource matters and to confirmation by the Legislature."  38 M.R.S. § 341-C(1) (2014).  "At least 3 members must have technical or scientific backgrounds in environmental issues and no more than 4 members may be residents of the same congressional district."  38 M.R.S. § 341-C(2) (2014).

(2014).[9]  Crucial to the matter before us, the very first paragraph of the Board's authorizing legislation establishes the Board's responsibility to "protect and enhance the public's right to use and enjoy the State's natural resources." 38 M.R.S. § 341-A(1) (2014).

[¶14]  Because the Board acted as the fact-finder and determined all legal issues de novo, we review the Board's decision—not the Department's decision—denying Champlain's application.  *See* 38 M.R.S. § 341-D(4) ("The [B]oard is not bound by the commissioner's findings of fact or conclusions of law but may adopt, modify or reverse findings of fact or conclusions of law established by the commissioner."); *Passadumkeag Mountain Friends v. Bd. of Envtl. Prot.*, 2014 ME 116, ¶¶ 8-10, 102 A.3d 1181 (holding in a wind energy case that the Board's decision, which was based on its independent analysis, was the decision on appeal, even though the Board did not supplement the administrative record in the course of its review); *see also Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶¶ 12-17, 15 A.3d 1263.

[¶15]  Our review of the Board's decision must therefore be "deferential and limited."  *Passadumkeag*, 2014 ME 116, ¶ 12, 102 A.3d 1181 (quotation marks omitted).  Although "statutory construction is a question of law, subject to de novo

---

[9] Among other responsibilities and authority, the Board is also explicitly authorized by the Legislature to recommend changes in the law.  38 M.R.S. § 341-B (2014).

review," *FPL Energy Me. Hydro LLC v. Dep't of Envtl. Prot.*, 2007 ME 97, ¶ 11, 926 A.2d 1197 (alteration omitted) (quotation marks omitted), "[w]hen reviewing an agency's interpretation of a statute that it administers, we defer to the agency's construction unless the statute plainly compels a contrary result," *Passadumkeag*, 2014 ME 116, ¶ 12, 102 A.3d 1181. "We do not second-guess an agency on issues within its area of expertise; rather, we review only to ascertain whether its conclusions are unreasonable, unjust, or unlawful."[10] *Town of Eagle Lake v. Comm'r, Dep't of Educ.*, 2003 ME 37, ¶ 8, 818 A.2d 1034 (quotation marks omitted).

## C.     Interpretation of the Wind Energy Act and Related Statutes

[¶17]  The generating facilities and wind turbines that make up the Project are proposed to be sited within the expedited permitting area; however, most of the nine great ponds affected by the Project—all of which are rated as outstanding or significant from a scenic perspective—are fully excluded from the expedited permitting area.  Thus, as previously noted, the Board was confronted with a project that falls directly between competing legislative priorities.  It is from that perspective that we review the Board's application of the applicable statutes.

---

[10]  Our deferential review of agency decisions has been the subject of legislative discussion in the past. *See* L.D. 1546 (125th Legis. 2011); Comm. Amend. A. to L.D. 1546, No. S-394 (125th Legis. 2012); 3 Legis. Rec. H-1381, S-2089 (2d Reg. Sess. 2012) (accepting minority report of ought not to pass). However, the Legislature has not enacted a provision that would alter this standard of review.

[¶18]  In reaching its determination that the Project would have an unreasonable adverse effect on the scenic character or existing uses related to scenic character of the nine affected great ponds, the Board considered (1) the "existing character of the surrounding area" and "significance of the potentially affected scenic resource," *see* 35-A M.R.S. § 3452(3)(A), (B); (2) the Legislature's intent in balancing the goal of encouraging and expediting wind power development with the goal of protecting Maine's scenic resources by limiting the geographic scope of the expedited permitting area; (3) the exclusion of most of the nine affected great ponds from the expedited permitting area; and (4) the unique interconnectedness of the affected great ponds, which would result in users being repeatedly confronted with views of the turbines from multiple scenic resources of state or national significance when traveling from one lake to another.

[¶19]  The statutes at issue neither prohibit nor explicitly allow or require the aggregated or "holistic" approach taken by the Board.  They do, however, explicitly require the Board to consider the "significance of the potentially affected scenic resource of state or national significance" and the "expectations of the typical viewer."  *Id.* § 3452(3)(A), (C).  In this context of competing legislative priorities and unusually interconnected scenic resources, we cannot conclude that the Board acted unlawfully or arbitrarily in its determination that the visual impact of the Project would have an unreasonable adverse effect on the existing scenic

character or existing uses related to the scenic character of the nine affected great ponds. *See Town of Eagle Lake*, 2003 ME 37, ¶ 8, 818 A.2d 1034.

[¶20] Given the authority granted to the Board by the Legislature and the Board's superior position for addressing the unique characteristics of each project when considering the effect of wind energy development on Maine's scenic environment, we cannot conclude that the statutes compel a result contrary to that reached by the Board. Mindful of the unique circumstances before us, and of the legislatively defined interests at stake, we defer to the Board's interpretation of the Maine Wind Energy Act and the statutes governing expedited permitting for grid-scale wind energy projects. *See id.*

The entry is:

Judgment affirmed.

**On the briefs:**

Juliet T. Browne, Esq., Scott D. Anderson, Esq., and Gordon R. Smith, Esq., Verrill Dana, LLP, Portland, for appellant Champlain Wind, LLC

Janet T. Mills, Attorney General, and Margaret A. Bensinger, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee Department of Environmental Protection

Frederick F. Costlow, Esq., Richardson, Whitman, Large & Badger, Bangor, for amicus curiae Partnership for the Preservation of the Downeast Lakes Watershed

Sean Mahoney, Esq., Conservation Law Foundation, Portland, for amicus curiae Conservation Law Foundation

**At oral argument:**

Juliet T. Browne, Esq., for appellant Champlain Wind, LLC

Margaret A. Bensinger, Asst. Atty. Gen., for appellee Department of Environmental Protection

Board of Environmental Protection number L-25800
FOR CLERK REFERENCE ONLY