299-12

✓

STATE OF MAINE                                    BUSINESS AND CONSUMER COURT
CUMBERLAND, ss                                    Location: Portland
                                                  Docket No.: BCD-AP-12-01

                                    )
NORTH ATLANTIC SECURITIES, LLC,     )
MICHAEL J. DELL'OLIO &               )
ASSOCIATES, and MICHAEL J.          )
DELL'OLIO,                          )
                                    )
            Petitioners,            )            DECISION AND ORDER
                                    )
     v.                             )
                                    )
MAINE OFFICE OF SECURITIES,         )
                                    )
            Respondent              )
                                    )

     Petitioners North Atlantic Securities, LLC (NAS), Michael J. Dell'Olio & Associates

(MJD), and Michael J. Dell'Olio seek judicial review, pursuant to 32 M.R.S. § 16609 (2011) and

M.R. Civ. P. 80C, of a decision of the Securities Administrator of the Maine Office of Securities

(MOS) dated February 2, 2011 (hereinafter, "Decision"). The Administrator concluded that

Petitioners committed "unlawful, dishonest or unethical practices," *see* 32 M.R.S. § 16412(4)(M)

(2011), and revoked the licenses of all three Petitioners, pursuant to 32 M.R.S. § 16412(2)

(2011). (Administrative Record (hereinafter, "A.R.") 2015-16.)

## FACTUAL BACKGROUND

     NAS is a broker-dealer located in Saco, ME, and has been licensed as such since 2003.

*See* 32 M.R.S. § 16401 (2011) (requiring licensure of broker-dealers conducting business in

Maine). (A.R. 1992.) MJD has been a Maine-licensed investment adviser since 2002 and shares

an office with NAS. (A.R. 1993.) *See* 32 M.R.S. § 16402 (2011) (requiring licensure of

investment advisers conducting business in Maine). Dell'Olio is an agent of NAS, *see* 32 M.R.S.

1

§ 16402, an investment advisor representative of MJD, *see* 32 M.R.S. § 16404 (2011), and owner of both firms. (A.R. 993.)

The client in question is Rachel Demers. Ms. Demers is Dell'Olio's mother in law and has been a brokerage and investment advisory client of Dell'Olio and his firms since December of 2003. (A.R. 1993.)

The 2006 Loan

The Administrator found that on or about June 16, 2006, Dell'Olio borrowed $20,000 from Ms. Demers; the money came out of an account that Ms. Demers had at NAS's clearing broker at the time.[1] (A.R. 1993.) Upon receipt of the $20,000, Dell'Olio put $11,750 of the funds into NAS and created a "payment schedule" setting forth repayment terms. (A.R. 1993.) Dell'Olio made several monthly payments, but did not repay $15,583 of the amount advanced. (A.R. 1993-94.) Three checks, each in the amount of $631, were paid to Ms. Demers from either MJD or Dell'Olio personally. The checks were dated August 4, 2006, September 11, 2006, and October 16, 2006. (A.R. 855-57.) During his deposition, Dell'Olio testified that the $20,000 payment was not a loan, but compensation for renovations that he made to a house owned by his wife. (A.R. 1994.)

The 2008 Loan

The Administrator found that on or about April 27, 2008, Dell'Olio persuaded Ms. Demers to loan Dell'Olio's son, Brian Dell'Olio, $150,000 so that Brian could purchase a building from which NAS and MJD would operate. (A.R. 1994.) Dell'Olio established a non-purpose loan account with Pershing, NAS's clearing firm, in the name of Ms. Demers and secured by the value of Ms. Demers' securities. (A.R. 1994.) Dell'Olio then had Ms. Demers

---

[1] Petitioners dispute this finding vigorously, asserting that the $20,000 was not a loan, but payment for renovations that Dell'Olio performed on Demers's home, for which payment he subsequently reimbursed Ms. Demers.

2

borrow $150,000 from Pershing in the account and wire the $150,000 to a bank account in the name of Delmore Associates, LLC (Delmore). (A.R. 1994.) Delmore's sole member is Brian Dell'Olio. (A.R. 1994.) Shortly thereafter, Delmore purchased the building where NAS and MJD are now located; most of the purchase was funded by a mortgage loan from Norway Savings Bank. Approximately $94,000 of the $150,000 received from Ms. Demers was used to purchase the building. (A.R. 1994-95.) Dell'Olio and his son used the remaining $56,000 for various other purposes, including $10,000 to pay off Dell'Olio's car loan, and approximately $4700 paid into the retail brokerage account of MJD. (A.R. 1995.)

Authorization Letters

On five occasions in 2008, Dell'Olio asked Ms. Demers to provide further money through the non-purpose loan account because of financial difficulties, in part due to margin calls on his personal brokerage account. (A.R. 1995.) To obtain the money, Dell'Olio needed Ms. Demers' written authorization. (A.R. 1995.) On at least three of the five occasions,[2] Dell'Olio did not obtain a new letter of authorization, but "cut and pasted" a copy of Ms. Demers' signature from an earlier letter of authorization to make it appear as if Ms. Demers had signed the new letters. (A.R. 1995-96.) Dell'Olio then submitted the forged letters to Pershing as if they were authentic. (A.R. 1996.) A total of $47,000 was wired into the Delmore account through the forged letters of authorization. (A.R. 1996.) $18,000 was then disbursed from that account to checking or brokerage accounts of MJD or Dell'Olio. (A.R. 1996.) The balance was used to cover business expenses of NAS and MJD. (A.R. 1996-97.) $14,000 was subsequently repaid to Ms. Demers. (A.R. 1997.)

---

[2] In the decision, the Administrator states that all subsequent five letters of authorization were not signed by Demers but were cut and paste "forgeries." (A.R. 2011.) Forgery is not used in the criminal sense; it is used to refer to the blanket prohibition against "forgery" in the Petitioners' written procedures. (A.R. 2011 n.18.)

3

## PROCEDURAL BACKGROUND

MOS issued a Notice of Intent on June 10, 2011. (A.R. 1-4, 1989.) The Notice of Intent was signed by Judith Shaw, the Administrator who presided over the hearing and issued the resulting Decision. (A.R. 4, 2017.) Petitioners requested a hearing on June 21, 2011. (A.R. 10, 1990.) Petitioners moved to disqualify Ms. Shaw from participating in the adjudication based on her involvement in the investigation of NAS, MJD, and Dell'Olio. (A.R. 12-25.) The Administrator, i.e. Ms. Shaw, denied the motion. (A.R. 93-95.)

After various pre-hearing procedures, the hearing commenced on October 26, 2011, and continued on November 7, 2011, ending that same day. (A.R. 1991.) During the hearing, Petitioners moved for dismissal of the allegations regarding the 2006 loan, arguing that they were time barred by the statute of limitations. *See* 32 M.R.S. § 16412(9) (2011). (A.R. 1904-06, 1998.) The Administrator denied the motion, but Petitioners renewed the argument in their written closing arguments. (A.R. 1908-09, 1946-47, 1998.) The Administrator issued her decision on February 2, 2012. (A.R. 2017.)

Title 32 M.R.S. § 16412(4)(M) prohibits a broker-dealer or investment adviser from engaging in "unlawful, dishonest or unethical practices in the securities, commodities, investment, franchise, banking, finance or insurance business." The Decision found four violations of section 16412(4)(M) for the following acts:

- borrowing money from a client;

- borrowing money from a client "for the express purpose of purchasing a building and then using a significant portion of the proceeds for other purposes" that benefitted all Petitioners;

- "creating and submitting authorization letters bearing false 'cut and paste' signatures"; and

- "making false statements to the Office of Securities."

4

(A.R. 2016.) The Administrator found Dell'Olio subject to discipline as the individual directly engaged in the conduct described and NAS and MJD subject to discipline as "control persons of those engaging in the conduct." *See* 32 M.R.S. § 16412(8) (2011) ("A person that controls, directly or indirectly, a person not in compliance with this section may be disciplined by order of the administrator . . . .").

Petitioners filed a timely appeal on February 9, 2012, in Kennebec Superior Court. The matter was transferred upon motion to the Business and Consumer Docket on March 16, 2012. The Court heard oral argument on June 1, 2012.

## STANDARD OF REVIEW

In an appeal of final agency action brought pursuant to M.R. Civ. P. 80C, the court reviews "the agency's decision for errors of law, abuse of discretion, or findings not supported by substantial evidence in the record." *Beauchene v. Dep't of Health & Human Servs.*, 2009 ME 24, ¶ 11, 965 A.2d 866, 870 (quotation marks omitted); *see also Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 8, 762 A.2d 551, 555. On appeal, the court may affirm the decision, 5 M.R.S. § 11007(4)(A) (2011), remand for further proceedings, 5 M.R.S. § 11007(4)(B) (2011), or:

> [r]everse or modify the decision if the administrative findings, inferences, conclusions or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by bias or error of law;
> (5) Unsupported by substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion.

5 M.R.S. § 11007(4)(C) (2011).

5

"The court shall not substitute its judgment for that of the agency on questions of fact." 5 M.R.S. § 11007(2) (2011). Factual findings must be affirmed if "they are supported by substantial evidence in the record, even if the record contains inconsistent evidence or evidence contrary to the result reached by the agency." *Concerned Citizens to Save Roxbury v. Bd. of Envtl. Prot.*, 2011 ME 39, ¶ 24, 15 A.3d 1263 (quotation marks omitted). Substantial evidence is "any competent evidence in the record to support a finding" based upon a review of the entire record to determine whether "the agency could fairly and reasonably find the facts as it did." *Id.* "An agency's findings of fact will be vacated only if there is no competent evidence in the record to support a decision." *Id.* ¶ 24, 15 A.3d 1263 (quotation marks omitted). Credibility determinations of witnesses are within the exclusive province of the Administrator as fact finder. *See Sprague Elec. Co. v. Me. Unemployment Ins. Comm'n*, 544 A.2d 728, 732 (Me. 1988).

## DISCUSSION

### I.     Statute of Limitations: 32 M.R.S. § 16412(9)

Petitioners first argue that proceedings related to the 2006 loan transaction are precluded by the limitations period set forth in 32 M.R.S. § 16412(9) because all the material facts were known to MOS in 2006. Title 32 M.R.S. § 16412(9) provides that "[t]he administrator may not institute a proceeding . . . based *solely* on material facts actually known by the administrator unless an investigation or the proceeding is instituted within one year after the administrator actually acquires knowledge of the material facts." (Emphasis added).

Petitioners argue that during a routine examination by MOS of NAS and MJD in 2006, MOS learned of the 2006 transfer of funds from Ms. Demers to Dell'Olio, and thus was "on notice" of the transaction. Two MOS employees examined NAS and MJD in 2006: Mr. Smedberg and Mr. Dyer. Dell'Olio testified at the hearing that the $20,000 was "used as part of

6

a repayment of a loan," that Ms. Demers should "make it out as a loan," and that the money was to "repay for expenditures that came out of my personal pocket to fix up the house." (A.R. 1910 at 231:19-25.) Later, Dell'Olio testified that he told Mr. Dyer that the transfer was a loan from Ms. Demers, but that Mr. Dyer was unconcerned because FINRA[3] regulations allowed such a loan. (A.R. 1910 at 232:1-17.) Based on MOS's alleged knowledge of the transaction in 2006 and failure to initiate an investigation until 2009, Petitioners contend that the transaction is barred by section 16412(9).

The Administrator rejected Petitioner's statute of limitations argument. (A.R. 1909, 1998-2001.) The Administrator reasoned that: "The statute precludes the initiation of a proceeding that is based 'solely' on material facts actually known unless the proceeding is initiated within one year. This investigation and proceeding, however, is based upon significant material facts discovered as recently as 2010." (A.R. 2000.) In her interpretation and application of the term "solely" in section 16412(9), the Administrator relied upon the official commentary to the Uniform Securities Act, which states:

> The addition of the word "solely" is intended to make it clear that an administrator may consider the prior history of an applicant or registrant even if that prior history had been known to the administrator for more than one year if there are additional material facts which are actually known to the administrator within the last year.

Joseph O. Steligman, *The New Uniform Securities Act*, 81 Wash. Univ. L. Q. 243, 284-85 (2003). (A.R. 2000-01.)

Petitioners argue that the Court should apply a "discovery rule" interpretation to section 16412(9). More specifically, citing *Donahue v. United States*, 634 F.3d 615 (1st Cir. 2011), *en banc reh'g denied*, 660 F.3d 523 (1st Cir. 2011), *cert denied*, *Macarelli v. United States*, No.

---

[3] FINRA is the Financial Industry Regulatory Authority, "the largest independent regulator for all securities firms doing business in the United States." *About FINRA*, FINRA.org, http://www.finra.org/AboutFINRA/ (last visited June 21, 2012).

7

11-838 (U.S., May 4, 2012), Petitioners contend that because reasonable inquiry would have revealed the transaction in 2006, MOS should be deemed to have knowledge as of that date. *Donahue*, however, involved a claim under the Federal Tort Claims Act (FTCA), which is fundamentally different than an action commenced pursuant to section 16412(9).[4] 634 F.3d at 616. That is, while section 16412(9) clearly states that only "actual knowledge" triggers the one year limitation period, "actual knowledge of the injury and its cause is not necessary for a claim to accrue" under the FTCA. *Donahue*, 634 F.3d at 623-24. Petitioners' reliance on *Donahue* is thus not persuasive.

For the Court to adopt the discovery rule as urged by Petitioners, the Court would improperly give no meaning to the legislature's use of the term "solely" in section 16412(9). *See Davis Forestry Prods, Inc. v. DownEast Power Co., LLC*, 2011 ME 10, ¶ 9, 12 A.3d 1180 ("All words in a statute are to be given meaning, and none are to be treated as surplusage if they can be reasonably construed."). The record supports the conclusion that the only material fact known by MOS in 2006 was the first $631 check,[5] and its materiality was not established until 2009. In

---

[4] In *Donahue*, the First Circuit addressed the accrual of causes of action under the FTCA for deaths associated with the FBI's use of informant Whitey Bulger, and explained:

> Actual knowledge of the injury and its cause is not necessary for a claim to accrue. A plaintiff who is unaware of the factual basis for his claim may be charged with such knowledge based on information that he reasonably should have known or discovered in the exercise of due diligence.

634 F.3d at 623-24 (citations omitted). Ultimately, a majority of First Circuit panel held that the plaintiffs' claims were barred by the statute of limitations. *Id.* at 630. Judge Torruella dissented from the decision and from the denial of the en banc rehearing, as did Judge Lipez and Judge Thompson. *Id.* at 631-39; *Donahue v. United States*, 660 F.3d 523, 524-31 (1st Cir. 2011).

[5] The Administrator discredited Dell'Olio's testimony on the 2006 transaction because it was not consistent with the notes of Mr. Dyer or Mr. Smedberg's testimony. (A.R. 1999.) Mr. Dyer's notes surround the August 4, 2006, check and state that the money was given to Dell'Olio by Ms. Demers to purchase building supplies and the $631 check was to return funds not used for the project. (A.R. 859, 1999.) Although three checks had been written at the time of the 2006 routine investigation, there was no mention in Mr. Dyer's notes of the second and third checks, and Mr. Smedberg did not recall those checks when presented to him at the hearing. (A.R. 1901 at 198:8-13.) Mr. Smedberg's testimony at the hearing was consistent with that explanation. (A.R. 1901 at 196:7-17.)

8

addition, the record contains numerous other material facts that were unknown until 2009. Given that MOS has asserted facts that it did not know prior to 2009, this action is not time barred.

II.     Sufficiency of the Evidence: 5 M.R.S. § 11007(4)(C)(5)

The Administrator found that the Petitioners engaged in four acts that were violations of 32 M.R.S. § 16412(4)(M), which acts involve the 2006 loan, the 2008 loan, alleged forgery, and alleged false statements. Petitioners challenge the sufficiency of the evidence for each violation.

A.     *The 2006 Loan*

The Administrator found that the 2006 transaction was a loan by Ms. Demers, a client, to Dell'Olio, her investment adviser. The Administrator's conclusion was based principally on Dell'Olio's testimony, a repayment schedule, and the three checks in the amount of $631. (A.R. 2001.) The repayment schedule, which is undated, sets forth the essential terms of the loan: principal borrowed, annual interest rate, period of repayment, and the date for each monthly payment. (A.R. 858.)

Citing Dell'Olio's testimony and affidavits submitted by Demers, Petitioners maintain that the 2006 transaction was not a loan. Petitioners argue that when she determined that the transaction was a loan, the Administrator viewed Dell'Olio's testimony out of context. (*See* A.R. 2001 (relying on testimony at A.R. 1801 at 81:23-82-4).) In support of this argument, Petitioners point to Dell'Olio's testimony in which he stated that "[i]t [the transaction] didn't start out that way," but that he and Demers later "made it a loan." (A.R. 1801 at 81:23-82-4.) Although some ambiguity arguably exists regarding Dell'Olio's testimony, the Administrator's findings are partly based on her assessment of the witnesses' credibility. In this regard, "the court shall not substitute its judgment for that of the agency on questions of fact." 5 M.R.S. § 11007(2). Thus, based on credibility determinations of Dell'Olio's testimony and other documentary evidence,

9

there is sufficient record evidence to support the factual conclusion that the transaction was a loan. *See Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263.

Upon concluding that the transaction was a loan, the Administrator determined that Dell'Olio and MJD violated 32 M.R.S. § 16412(4)(M) because the pertinent MOS rule prohibits an investment advisor or an investment adviser representative from borrowing money from a client. *See* 02-032 C.M.R. ch. 515, § 14(6) (2008); *see also* 32 M.R.S. § 16605(1) (2011) (constituting the Administrator's rule-making authority).[6]

The Administrator also found that NAS violated 32 M.R.S. § 16412(4)(M) because the applicable MOS rule prohibits a broker-dealer or its agent from borrowing money from a client:

> A person may be deemed to have engaged in "dishonest or unethical practices" under Section 16412(4)(M) of the [Maine Securities] Act if the person engaged in practices including but not limited to one or more of the following:
>
> . . . .
>
> 36. As an agent, lending money or securities to, or borrowing money or securities from, a customer, or acting as a custodian for money, securities or an executed stock power of a customer, unless:
>
> > A. *The broker-dealer has written procedures allowing such an arrangement*; and
> >
> > B. The customer is:

---

[6] The rule states in pertinent part:

> A person may be deemed to have engaged in "dishonest or unethical practices" under Section 16412(4)(M) of the [Maine Securities] Act if the person engaged in practices including but not limited to one or more of the following:
>
> . . . .
>
> 6. Borrowing money or securities from a client unless the client is a broker-dealer, an affiliate of the investment adviser, or a financial institution engaged in the business of loaning funds.

02-032 C.M.R. ch. 515, § 14(6). The parties do not contend that any of the exceptions to the rule apply here.

(1)     a member of the agent's immediate family or another person whom the agent supports, directly or indirectly, to a material extent;

(2)     a financial institution regularly engaged in the business of providing credit, financing, or loans, or other person that regularly arranges or extends credit in the ordinary course of business; or

(3)     a licensed agent of the same broker-dealer, if the broker dealer has given advance written authorization for the arrangement.

02-32 C.M.R. ch. 504, § 8(36) (2008) (emphasis added). The Administrator specifically found that NAS had not adopted written procedures that permitted the loan during the relevant time period and thus the exception in section 8(36)(B)(1) of Rule 504 did not apply. (A.R. 2002-06.)

Petitioners assert that NAS's Written Supervisory Procedures (WSPs) contained a family member loan exception in early 2006 and, therefore, the evidence does not support the Administrator's findings. At the hearing, numerous versions of NAS's WSPs were admitted into evidence. The version advocated by Petitioners (Petitioners' Exhibit C1) contains the family member exception, which version reflects an effective date of February 28, 2006. (A.R. 1323.) The WSP supplied by Petitioners at hearing differed from the WSP that Petitioners provided to MOS in 2006 during the routine examination—the WSP provided in 2006 to MOS did not include the family member exception but indicated the same effective date. (A.R. 213.) Simply, the Administrator discredited Petitioners' evidence and credited the evidence provided by MOS. In part, the Administrator discredited the WSP that Petitioner introduced at the hearing because it did not contain the naming convention that a former NAS employee testified that NAS used to ensure the correct version is being used. (A.R. 2004.) Once again, the Administrator determined which evidence was more credible. Credibility determinations are properly within the Administrator's discretion. The evidence, therefore, is sufficient to support the finding that

11

NAS's WSPs did not contain the family member exception in 2006. *See Concerned Citizens to Save Roxbury*, 2011 ME 39, ¶ 24, 15 A.3d 1263.

B.    *The 2008 Loan*

The Administrator concluded that the $150,000 loan from Demers to Delmore was "effectively a loan for [Petitioners]," (A.R. 2009), because "Delmore was used, in part, as a conduit to transfer funds from Ms. Demers' account to Dell'Olio and his firms" (A.R. 2007). The Administrator based this conclusion the following findings regarding Dell'Olio's involvement in the loan:

- Dell'Olio convinced Demers "to arrange for the loan by setting up a non-purpose loan account using some of her securities as collateral";

- Dell'Olio created the non-purpose loan account;[7]

- Dell'Olio, on his own behalf and on behalf of MJD, guaranteed the mortgage to Delmore from Norway Savings Bank;

- Dell'Olio wrote checks on Delmore's checking account; and

- A portion of the loan proceeds were used to pay off the balance owed on Dell'Olio's car loan.

(A.R. 2006-08.)

Petitioners argue that the loan was not to Dell'Olio and his firms, but was in fact a loan from Demers to Delmore. According to Petitioners, Dell'Olio only guaranteed the loan to Norway Savings Bank because he is Brian Dell'Olio's father. In her conclusions of law, the Administrator specifically determined: "By borrowing money from Ms. Demers for the express purpose of purchasing a building and then using a significant portion of the proceeds for other

---

[7] Dell'Olio later withdrew additional funds from Demers's non-purpose account to cover his own margin calls, putting Dell'Olio's account at risk for margin calls. (A.R. 2008.)

12

purposes all benefitting Respondents, they committed unlawful, dishonest, *and* unethical practices." (A.R. 2016 (emphasis added).)

Petitioners argue that the loan was in fact from Demers to Delmore, not to Dell'Olio or his companies, and that Dell'Olio only guaranteed the loan to Norway Savings Bank because he is Brian's father. The Administrator explicitly rejected this argument, stating that Petitioners "wish to hide behind the fact that the loan was made to Delmore Associates in order to avoid any inference that [Petitioners] were the true benefactors." (A.R. 2007.) The Administrator also reasoned that

> [b]roker-dealers and their agents, while not held to the same fiduciary standard as investment advisers, are held to a high standard of conduct. In considering conduct that may be viewed as antithetical to the interests of investors and potentially dishonest, regulators take a broad view. In fact, FINRA has looked askance at borrowing practices that involve recommending a client make a questionable loan to a third party.

(A.R. 2008-09.) MOS argues that the evidence supports the Administrator's finding that Dell'Olio was a recipient of the loan and that his actions were dishonest and unethical, given the admission that Petitioners' financial situation was such that they could not pay any rent to Delmore. (A.R. 2009.)

The Court acknowledges that to the extent that the Administrator characterized the 2008 loan to Delmore as an unlawful loan to Dell'Olio, NAS, and MJD, Petitioners' challenge to the finding might have some merit. That is, on its face, the form of the transaction reflects a loan to Delmore. The Court need not, however, determine whether the Administrator can properly conclude that the transaction constitutes an actual loan to Dell'Olio in contravention of section 16412(4)(M). The Administrator's overall assessment of the transaction – that it was an attempt to circumvent the prohibition against a loan by a client to an advisor, and a way to provide funds for Dell'Olio's use – is supported by substantial evidence on the record. In this way, the

13

Administrator's conclusion that the transaction constitutes unethical and dishonest conduct (A.R. 2016) is supported by substantial evidence on the record.

C. *Forgery*[8]

The Administrator found that Dell'Olio's use of cut and pasted signatures as authorization for withdrawals from the non-purpose account during 2008 and 2009 constitutes a falsification of records and was thus a dishonest and unethical practice. (A.R. 2011-14) Petitioners assert that Ms. Demers knew and approved of the use of her signature, citing affidavits by Ms. Demers that support their assertion that she knew of the cut and pasting and in fact directed Petitioners to do so. (A.R. 971, 974, 978.)

Contrary to Petitioners' argument, Demers' knowledge of and intent regarding the signatures are not controlling. The NAS WSPs during the relevant time period expressly prohibit the signing of a client's name: "Regardless of intention – whether authorized by the client or done for the client's convenience – no employee may sign a client's name to any document." (A.R. 398.) The decision does not address directly the involvement of MJD in the withdrawals, but some of the funds were then deposited into MJD accounts, thus implicating the control provisions of 32 M.R.S. § 16412(8). The Administrator's factual conclusions regarding the cut and pasted signatures are supported by substantial evidence on the record.

D. *False Statements*

The Administrator also determined that Dell'Olio made false statements to MOS staff during his deposition when he claimed that the $20,000 loan was not a loan but compensation for renovations that he performed on a house owned by his wife. (A.R. 1994.) The record reveals that at his deposition, Dell'Olio stated that the $20,000 payment was compensation for work that

---

[8] The decision makes clear that the Administrator is not using forgery in the criminal sense. Forgery refers to Petitioners' blanket prohibition against "forgery" in their WSPs. (A.R. 2011 n.18.)

14

he performed on the house (A.R. 872-73). Because the Administrator concluded that the $20,000 payment was in fact a loan (A.R. 2002), and because as explained above this conclusion is supported by record evidence, the Administrator's determined that Dell'Olio's testimony is a false statement is supported by substantial evidence in the record.

III.    Constitutionality and Bias:  5 M.R.S. § 11007(4)(C)(1), (4)

Petitioners contend that the participation of the Administrator, Ms. Shaw, at the hearing was unconstitutionally biased because Ms. Shaw also issued the "Notice of Intent" by which Petitioners' licenses were revoked and thus she improperly participated in both an investigatory and adjudicatory capacity in these proceedings.

As to participation by administrators in both investigatory and adjudicatory capacities, the United States Supreme Court has said:

> The contention that the combination of investigative and adjudicative functions necessarily creates an unconstitutional risk of bias in administrative adjudication has a much more difficult burden of persuasion to carry. It must overcome a presumption of honesty and integrity in those serving as adjudicators; and it must convince that, under a realistic appraisal of psychological tendencies and human weakness, conferring investigative and adjudicative powers on the same individuals poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented.
>
> . . . .
>
> It is not surprising, therefore, to find that "[t]he case law, both federal and state, generally rejects the idea that the combination [of] judging [and] investigating functions is a denial of due process . . . ." 2 K. Davis, Administrative Law Treatise § 13.02, p. 175 (1958). Similarly, our cases, although they reflect the substance of the problem, offer no support for the bald proposition applied in this case by the District Court that agency members who participate in an investigation are disqualified from adjudicating. The incredible variety of administrative mechanisms in this country will not yield to any single organizing principle.

*Withrow v. Larkin*, 421 U.S. 35, 47, 52 (1975). Petitioners acknowledge the reasoning of *Withrow*, but assert that the present case is distinguishable because Ms. Shaw made a

15

determination on the merits by signing the Notice of Intent insofar as the notices operated to revoke the licenses unless Petitioners chose to request a hearing.

In her decision denying Petitioners' motion for disqualification, Ms. Shaw confirms that she only signed the notice of intent and did not participate in the investigation. (A.R. 93-95.) Petitioners cite no record evidence to support their contrary conclusion, other than the form of the notice itself, which they assert is self-effectuating. Absent any record evidence to establish that Ms. Shaw made a determination on the merits prior to the hearing, the Court finds no constitutional violation from Ms. Shaw presiding over these proceedings. As explained by the United States Supreme Court,

> [i]t is also very typical for the members of administrative agencies to receive the results of investigations, to approve the filing of charges or formal complaints instituting enforcement proceedings, and then to participate in the ensuing hearings. This mode of procedure does not violate the Administrative Procedure Act, and it does not violate due process of law.

*Withrow*, 421 U.S. at 56.

IV.    Abuse of Discretion: 5 M.R.S. § 11007(4)(C)(6)

Petitioners argue that the discipline imposed through the Decision is an abuse of the Administrator's discretion in two ways: 1) the license revocation is too harsh of a penalty, and 2) the penalty should not have been levied against NAS and MJD. In particular, Petitioners contend that the license revocation is inappropriate because: Dell'Olio has no prior history of questionable conduct; the subject transactions involved a family member; Ms. Demers was not the complaining party and has repeatedly supported Dell'Olio and his conduct; the license revocation is disproportionate when compared to the conduct; and the license revocation is inconsistent the sanction imposed in similar cases.

16

The parties agree that abuse of discretion is the appropriate standard when evaluating the imposed discipline.

> An abuse of discretion may be found where an appellant demonstrates that the decisionmaker exceeded the bounds of the reasonable choices available to it, considering the facts and circumstances of the particular case and the governing law. It is not sufficient to demonstrate that, on the facts of the case, the decisionmaker could have made choices more acceptable to the appellant or even to a reviewing court.

*Sager v. Town of Bowdoinham*, 2004 ME 40, ¶ 11, 845 A.2d 567 (citing *Steuben v. Lipski*, 602 A.2d 1171, 1172 (Me. 1992)).

The Court recognizes that because the victim of Petitioners' conduct is a supportive relative of Dell'Olio, the Administrator's statutory mandate to protect the public might not be as critical as in cases in which members of the general public experience losses as the result of an advisor's misconduct. Nevertheless, given the Administrator's factual findings, which are supported by record evidence, the Administrator's concerns about the public interest were warranted. As explained above, the Administrator's findings establish that Petitioners failed to abide by agency rules, that Petitioners failed to comply with NAS's own WSPs, that Dell'Olio improperly signed documents on behalf of a client, and that Dell'Olio made false statements to MOS about the 2006 transaction. The violations are serious, and objectively can justify a significant sanction. Given the seriousness of the violations, and given that Petitioners have not been barred from acting as a broker-dealer or an investment adviser in the future, *see, e.g., In re Douglas G. Bezio*, No. 11-7133 (Me. Office of Securities, Mar. 4, 2012) (distinguishing between a revocation and a bar), license revocation does not exceed the bounds of reasonable choices. *See Sager*, 2004 ME 40, ¶ 11, 845 A.2d 567.

Finally, although the Decision does not distinguish among the three Petitioners, the Administrator found that NAS and MJD were "control persons." (A.R. 2016.) Section 16412

17

permits the Administrator to discipline control persons as well as those directly engaging in the prohibited conduct:

> **8. Control person liability.** A person that controls, directly or indirectly, a person not in compliance with this section may be disciplined by order of the administrator under subsections 1 to 3 to the same extent as the noncomplying person, unless the controlling person did not know, and in the exercise of reasonable care could not have known, of the existence of conduct that is a ground for discipline under this section.

32 M.R.S. § 16412(8) (2011). Petitioners do no assert that any of the exceptions to this provision apply in this case. The decision to hold MJD and NAS liable as control persons does not "exceed[] the bounds of the reasonable choices available." *Sager*, 2004 ME 40, ¶ 11, 845 A.2d 567.

## CONCLUSION

Based on the foregoing the court decides and orders as follows:

The Court affirms the decision of the Securities Administrator of the Maine Office of Securities (MOS) dated February 2, 2011, in its entirety.

Pursuant to M.R. Civ. P. 79(a), the Clerk shall incorporate this Decision and Order into the docket by reference.

Date: 7/10/12

_____
Justice, Maine Business & Consumer Court

18